IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

ADONIA K. SMITH,                )
                                )
     Plaintiff,                 )
                                )
                                )
        v.                      )   Case No. 1:15cv956 (JCC/TCB)
                                )
                                )
LOUDOUN COUNTY PUBLIC SCHOOLS,  )
                                )
     Defendant.                 )

**M E M O R A N D U M   O P I N I O N**

This matter came before the Court on Defendant's
motion for summary judgment.  [Dkt. 31.]  For the reasons stated
below, the Court will grant the motion in part and deny the
motion in part.  Also before the Court is Plaintiff's motion for
reconsideration of the Court's January 21, 2016 motion-in-limine
order.  [Dkt. 44.]  The Court will deny the motion to
reconsider.

**I.   Background**

This lawsuit concerns Loudoun County Public Schools'
("Loudoun Schools" or "Defendant") employment of Plaintiff Dr.
Adonia K. Smith ("Smith").[1]  Loudoun Schools hired Smith in
August 2007 as a teacher of special education for the hearing

---

[1]    References to SOF indicate an undisputed fact contained
within Defendant's statement of facts in its memorandum in
support of summary judgment.  (Mem. in Supp. [Dkt. 40] at 2-21.)

impaired at Francis Hazel Reid Elementary School ("FHR").
(Pl.'s Ex. 10.)  Smith, who has been profoundly deaf since birth
and is fluent in American Sign Language ("ASL"), was assigned to
teach several students who are also deaf or hard of hearing.
(Smith Decl. ¶¶ 2-4.)  A large part of Smith's job was managing
the Individualized Education Plans ("IEP") for two deaf
students, VR and JC.  (Smith Decl. ¶¶ 2-5.)  In this role, Smith
oversaw the students' IEPs by drafting the plans, soliciting
parent and administrator approval of the plans, assessing and
collecting student performance data, and recording the students'
progress as required by law.  (Kearny Depo. at 35-37; McCartin
Depo. at 37-38.)  During her three years at FHR, Smith also had
teaching and case-management responsibility for other students.
(Smith Decl. ¶¶ 3-4; McCartin Depo. at 72.)

        Loudoun Schools attempted to accommodate Smith's
disability in several ways.  At all times during Smith's
employment, Loudoun Schools maintained a contract with an
interpreter placement company, WeInterpret, to provide state-
qualified ASL interpreters at scheduled events, such as staff
meetings, parent-teacher conferences, IEP meetings, and other
employer-sponsored events.  (Def.'s SOF ¶ 13.)  When Smith could
anticipate her own need for an interpreter outside of scheduled
events, she could also request a WeInterpret interpreter.
(Smith Depo. at 37.)  According to Smith, however, interpreters

occasionally did not show up as requested or did not meet her expectations. (*Id.*)

To accommodate the need to verbally communicate with people outside of FHR or not in the same room as Smith, Loudoun Schools installed a video relay phone in her class in spring 2009. (Smith Depo. Ex. 32.)  This phone allowed her to sign ASL into a screen linked to an interpreter who would verbally translate the call through a standard phone line. (*Id.*)  In addition to the phone in her room, FHR placed a second phone in a workroom across the hall. (Kovach Depo. at 93-95.)  In October 2009, administrators removed the phone from Smith's classroom and placed it in a locked equipment room in the library. (Smith Decl. ¶ 19.)  Although these accommodations were eventually the subject of much dispute, Smith's first two years at FHR were relatively unproblematic.[2]

All records indicate that Smith succeeded during her first year as a teacher at FHR.  During that time, Smith worked closely with two hearing teachers who were also fluent in ASL and would occasionally interpret for her. (Smith Decl. ¶ 1; DeSuza Decl. ¶ 8.)  In the spring of this first year, another ASL-proficient teacher joined FHR and would also occasionally interpret for Smith. (Long Decl. ¶¶ 2, 8.)  With the friendship

---

[2]    Defendant also provided access to accommodations like audio visual equipment and a laptop, which are not at dispute in this case. (Briner Decl. ¶ 12.)

and help of these colleagues, Smith flourished at FHR.  The principal gave her a favorable end-of-year review, applauding Smith's "positive impact" on students and "compassionate and dedicated" demeanor.  (Pl.'s Ex. 7.)

Smith's second year at FHR began much like the first year ended.  In December, Loudoun Schools' new deaf and hard of hearing specialist, Eileen McCartin ("McCartin"), evaluated Smith as using "effective and explicit instructional strategies," having "very positive interactions" with her student, and being "very responsive to the child's individual learning style and unique needs."  (McCartin Depo. Ex. 1.) Smith left for winter break apparently on good terms with all students, faculty, and administrators at FHR.

At the beginning of the spring 2009 semester, however, the hard and hearing department at FHR undertook a new educational direction.  In the last week of February, the principal held a meeting to announce that FHR would adopt a "total communication approach" to educating deaf and hard of hearing students.  (Def.'s SOF ¶ 23.)  Under this approach, teachers use whatever communication method is effective for teaching a hearing-impaired student, whether that method is ASL, non-ASL sign languages, spoken English, fingerspelling, or any other method.  (Def.'s SOF ¶ 24; McCartin Depo. at 91-93; McGraw Depo. at 113.)  There is some evidence that Smith fundamentally

4

disagrees with the total communication approach because it does not prioritize ASL. (McGraw Depo. at 112-14; Jochems Depo. at 141-42 (calling Smith "resistant" to the school's policy).) For example, five days after the meeting, Smith wrote in an email to her students' guardians that total communication "creates communication mess in the Deaf community," "should be discarded in favor of ASL-English bilingual education," is akin to the "oppression of language and communication," and is "a kind of patronizing at the Deaf-centric education." (Def.'s Ex. 35.) In her deposition, however, Smith contends that her disagreement with total communication is limited to her belief that ASL is absolutely necessary for deaf students, as it is "a pure visual language" that gives students a foundation for learning other subjects. (Smith Depo. at 154-61; McCartin Depo. at 30-31.)

Days after the February meeting, Smith submitted a request that a full-time interpreter be made available for her every day. (Def.'s SOF ¶ 26; Smith Depo. Exs. 25, 26, 37.) Smith explained that a full-time interpreter would "be a big help to me for my interaction with school administrators, teachers, staff members, parents, and students who don't know ASL." (Smith Depo. Ex. 25.) The principal submitted the request to Loudoun Schools' risk management division, which began to investigate the issue with the employee benefits department. (Smith Depo. Exs. 26, 30, 31, 36.) Personnel from

these departments discussed the request through email and occasionally involved Smith in that conversation.  (*Id.*)  By October 2009, the investigation was ongoing and had expanded to include benefits coordinator Michele Kovach, deaf and hard of hearing specialist Eileen McCartin, the FHR assistant principal, two representatives from the teachers' association, and assistant principals from other schools employing deaf individuals.  (Kovach Depo. Exs. 2-12.)

Shortly after submitting the request, Smith received her first documented reprimand for interpersonal conflicts at FHR.  On March 13, 2009, the assistant principal reprimanded Smith for getting "angry and hostile" toward a substitute teacher when a student attempted to interpret between Smith and the substitute.  (Smith Depo. Ex. 26.)  The assistant principal also expressed disappointment that Smith had not heeded his "plea on two occasions for teamwork and professionalism."  (*Id.*)  According to Smith's account, by contrast, the substitute "popped up" in the classroom, asked the student to interpret, and then "told on" Smith for preventing the student from interpreting.  (Smith Depo. at 168.)

Even with this March reprimand, Smith received an overall satisfactory performance review for her second year and Loudoun Schools renewed her contract for a third year.  (Def.'s Ex. 52.)  The principal's end-of-year review applauded Smith for

using "good teaching strategies and techniques" and serving as "an excellent model for ASL." (*Id.*) But the review also noted areas for improvement, including lesson planning, student assessment, timely IEP management, and "knowledge base of the curriculum and Standards of Learning." (*Id.*) The principal also encouraged collaboration with general education teachers and recommended that Smith "work with a mentor on the issues mentioned" in the evaluation. (*Id.*)

Smith filed a rebuttal to the principal's critiques. (Def.'s Ex. 53.) With respect to her knowledge base, Smith wrote that she was "familiar with the curriculum and standards of learning," but that she had to teach "differently from the established curriculum in order to maximize" her students' learning. (*Id.*) Regarding her IEP management, Smith wrote that all the teachers at FHR were still learning the new IEP process and that her IEPs were delayed because parents exercised their rights to refuse to sign the IEPs. (*Id.*) Smith also rebutted that she "was fully ready to work closely with the regular classroom teacher but [that teacher's] attitude was condescending." (*Id.*) Lastly, Smith wrote she would request technical assistance for implementing lesson planning on the computer, but she "doesn't require having a mentor." (*Id.*)

Over the summer, several changes occurred at FHR that affected Smith's job performance. First, the two ASL-fluent

teachers who previously interpreted for Smith were transferred, leaving her less able to verbally communicate in an impromptu manner.  (DeSuza Decl. ¶ 17; Martinez Decl. ¶ 4.)  For a few months in fall 2009, Smith continued to rely on another employee for some daily interpretation needs.[3]  But in October 2009, that employee was also transferred.  (Michelle Decl. ¶¶ 2-3; McCartin Depo. at 106.)  Second, Brenda Jochems ("Jochems") and Ellen McGraw ("McGraw") took over as the principal and assistant principal, respectively.  (Def.'s SOF ¶ 37.)  Lastly, the school adopted the Virginia Grade Level Assessment ("VGLA") methods for testing disabled students, which altered Smith's student-evaluation and record-keeping responsibilities.  (Smith Decl. ¶ 38.)

Soon into the fall 2009 semester, Smith submitted a new accommodation request for an interpreter to assist her for a portion of every school day.  (Def.'s Exs. 36, 54.)  This request became part of the ongoing investigating into the feasibility of a full-time interpreter.  (Def.'s SOF ¶ 38; Def.'s Ex. 54; Jochems Depo. at 21; Kovach Depo. Ex. 5.)  Smith met with a benefits representative on October 7, 2009, regarding her requests.  (Smith Decl. ¶ 18.)  Instead of granting the

---

[3]     Jochems testified, however, that Smith "would get mad at us if we ever tried to use Michelle to interpret for us because [Smith] would say that Michelle is for students and that she needed an adult interpreter, so we never even tried to use Michelle to interpret."  (Jochems Depo. at 196.)

accommodations, however, the administration moved the video relay phone from Smith's classroom to a locked equipment room in the library.  (Smith Decl. ¶ 19.)  In response, Smith added the return of her video relay phone to her previous accommodation requests.

Around the same time in October 2009, Smith received several letters of reprimand for interpersonal conflicts.  On October 13, 2009, Assistant Principal McGraw reprimanded Smith for her "inappropriate behavior" during a September IEP meeting. (Def.'s Ex. 60.)  According to McGraw, Smith attempted to leave the meeting shortly after it began and then contributed only unproductive comments, such as "whatever you think" and "I agree with them," even when no one else had made a suggestion.  (*Id.*) Smith rebutted this account of the meeting in a letter explaining that her statements were merely an attempt to "allow the process to move forward, since there was agreement among the majority."  (Pl.'s Ex. 33.)  Smith also wrote that she "did not feel supported by the team" regarding her findings of the student's academic and social development, and was troubled that her "perspective did not seem to be truly considered."  (Pl.'s Ex. 33.)

Also on October 13, 2009, deaf and hard of hearing specialist McCartin sent a letter of reprimand citing concerns about Smith's "professional conduct and behavior."  (McCartin

Depo. Ex. 4.)  McCartin wrote that over several months she had observed "a pattern of behavior that has become more and more unprofessional and unproductive." (*Id.*)  In particular, she listed a September 22 incident when Smith became "irate" after being assigned to continue teaching VR and JC. (*Id.*)  McCartin said Smith refused to accept the assignment because she was "burned out and wanted a normal child" to teach and that Smith continued this "outburst" for several minutes by using "aggressive language, glaring, pushing papers on the desk, banging the desk with your fists, etc." (*Id.*)  Smith rebutted by letter stating that she never refused to accept the new position but instead merely "felt strongly that VR and JC deserve to have a different teacher (new one) and, at the same time, I need some break from hard-working with VR and JC." (Pl.'s Ex. 31.)  Smith also accused McCartin of making up the story about the outburst "to sound like I behaved such a way." (Pl.'s Ex. 31.)  McCartin responded to this last point with her own rebuttal, writing "I take serious offense that you would accuse me of providing false information." (McCartin Depo. Ex. 5.)

On October 16, 2009, Principal Jochems also reprimanded Smith by letter for an event occurring on October 9, 2010. (Def.'s Ex. 61.)  Jochems wrote that Smith refused to allow a deaf substitute teacher to enter Smith's classroom and

degraded the teacher by writing on a white board, "She's deaf. She cannot help me." (*Id.*) Jochems characterized the comment as "extremely offensive," and described Smith's behavior as "unprofessional and demonstrat[ing] a flagrant disregard for my expectation of how you are to work with your colleagues as a teacher at this school." (*Id.*) Smith rebutted with a letter saying that she merely told the substitute she could leave "because she was not needed." (Pl.'s Ex. 34.) Smith also stated that a communication breakdown from lack of interpreters caused others to misunderstand her attempt to "be helpful in solving the problem by sending [the substitute] back to her duties as a teacher's aide so her time could be better spent in her classroom." (*Id.*)

About three weeks after these letters of reprimand, employee benefits reached a final decision on Smith's accommodation requests. On November 3, 2009, the employee benefit supervisor sent a letter denying Smith's requests for a video relay phone in her classroom, an interpreter for one and a half hours each day, and a daily full-time interpreter. (Pl.'s Ex. 35.) The supervisor justified this denial by noting that Smith already had access to two video relay phones in FHR and that the school would accommodate impromptu verbal

interpretation by installing a video remote interpreting service[4] "within the next 60 days." (*Id.*) This service, however, was not functionally installed until seven months later. (Kovach Depo. at 79.)

Later in November, Smith received more bad news when the principal placed her on the "December List," an indication that her contract might not be renewed if her performance did not improve. In a letter explaining this decision, Jochems criticized Smith for insufficient and untimely lesson planning, inadequate student assessment, poor and untimely IEP management, and strained professional relationships with the special education team "that has caused undue stress and hurt feelings." (Def.'s Ex. 69.) These performance assessments were based on Jochem's informal observations of Smith's teaching, the three letters of reprimand, and a formal observation report by Assistant Principal McGraw finding Smith needed improvement in lesson pacing, gradebook planning, promptness, and professional attitude. (*Id.*; Jochems Depo. at 26-27; McGraw Depo. Ex. 3.)

Smith sent a rebuttal letter noting her disagreement with Jochems' assessment. Smith contested that her lesson planning was insufficient by stating that "[l]esson plans are available for review at any time." (Pl.'s Ex. 30.) Next, Smith

---

[4]    This service allows two people in the same room to communicate to an interpreter on a video screen who then translates ASL to English and vice versa. (Def.'s Ex. 46.)

said Jochems's finding of inadequate student assessment was based on a communication breakdown involving an interpreter at the September IEP meeting.  (*Id.*)  Smith blamed the untimely IEPs on her students' parents, who timely received the plans but refused to sign them.  (*Id.*)  Smith also reiterated that she was not to blame for the incidents prompting the reprimand letters. (*Id.*)  Lastly, Smith complained that she was placed on the December List without the two formal observations and meetings required by school policy.  (*Id.;* Pl.'s Ex. 16 (describing policy).)

After being placed on the December list, Smith was assigned several support mentors.  One employee began to work with Smith to improve IEP preparation.  (Def.'s SOF ¶ 54.) Another helped with completion of the VGLA binders required under state law.  (*Id.*)  A third mentor helped with lesson planning.  (Jochems Depo. at 34-35; Def.'s Ex. 74.)  Smith also began to meet with Jochems and a representative of the teachers' association each week to discuss expectations and progress. (Jochems Depo. at 74; Def.'s Ex. 72.)

Despite those intervention efforts, Smith's performance reviews did not markedly improve.  After a formal observation on February 19, 2010, Jochems found Smith needed improvement in several areas, including methods of teaching, student involvement, and management.  (Def.'s Ex. 80.)  Jochems

13

attached a detailed written report of her observation with a
concluding remark that "[t]he pace of the lesson and what little
was accomplished in one hour is alarming." (*Id.*)  At a post-
observation conference three days later, Jochems gave Smith a
mid-year rating of unsatisfactory.  (Def.'s Ex. 81.)  Jochems
noted that Smith showed "some improvement" in the areas of
planning, assessment and record keeping, and timely IEP
completion, but also critiqued Smith for deficiencies in
developing "a balanced approach to teaching American Sign
Language and the Standards of Learning Curriculum at a pace that
allows the children to reasonably advance." (*Id.*)  Jochems also
criticized Smith for not developing her students' reading
abilities and creating tension with colleagues.  (*Id.*)  Due to
these deficiencies, Jochems did not recommend the renewal of
Smith's contract.  (*Id.*)  A week later, the Loudoun Schools
superintendent informed Smith by letter that he did not plan to
recommend her contract be renewed.  (Def.'s Ex. 82.)

        After receiving the evaluation and the
superintendent's letter, Smith filed a rebuttal to Jochems's
February observations.  The main contention of this letter was
that Jochems failed to understand the requirements of teaching
students to read English and speak ASL in the same lesson.
(Pl.'s Ex. 36.)  Smith also suggested that the interpreter
Jochems was using likely misinterpreted her, leading to

14

misevaluation.  (*Id.*)  To refute Jochems's critique that the students were underperforming, Smith wrote "I am disappointed that the observer failed to understand the children's progress or ability to comprehend stories . . . . I am evaluated negatively because the children are exhibiting behavior that causes them not to complete their tasks, when in fact, their behaviors demonstrate how much they have progressed in their language."  (*Id.*)

This brings the timeline to April 2010.  Unbeknownst to the FHR administration, Smith submitted a charge of discrimination to the Equal Employment Opportunity Commission ("EEOC") in January 2010.  (Def.'s Ex. 114.)  Because of an administrative error, the EEOC did not receive the charge until April 1, 2010.  (*Id.*)  Smith filed a second EEOC charge on April 2, 2010, alleging that Defendant terminated her because of her disability.  (Def.'s Ex. 115.)  These two charges were forwarded to Loudoun Schools' counsel, the risk management supervisor, and another defense attorney on April 7 and April 12, respectively.  (Def.'s SOF ¶¶ 67, 70.)  There is no evidence that anyone in the administration at FHR ever knew about the EEOC charges until this lawsuit was filed.  (Jochems Depo. at 190.)

Also in April, Principal Jochems, after consultation with the director of special education, sent a letter to the superintendent recommending that Smith be immediately

terminated.  (Jochems Depo. Ex. 17; Jochems Depo. at 169.)  The
letter listed many new instances of misconduct that occurred
after Smith's February 2010 evaluation.  First, Jochems cited
four instances of "[o]ngoing and blatant insubordination."
(Jochems Depo. Ex. 17.)  Those incidents included Smith
unilaterally deciding to stop attending her required VGLA mentor
meetings, suspiciously calling in sick for the same days that a
leave request was denied, and several other disputes listed as
email conversations.  (*Id.*)  Second, the letter accused Smith of
creating a "hostile work environment that is impacting the
children."  (*Id.*)  This allegation included an incident when
Smith allegedly attempted to slam a door in another employee's
face, which a third party witnessed.  (*Id.*; Def.'s Exs. 86, 87.)
Additionally, the letter noted that a consulting teacher would
no longer work with Smith unless an administrator was present.
(Jochems Depo. Ex. 17.)  Third, the letter criticized Smith's
failure to meet deadlines, including missing five review and
revision meetings, and issues involving the location of her VGLA
binders.  (*Id.*)  Administrators learned three days after the
letter that Smith had taken the binders home, in violation of
state law and direct orders.  (Jochems Depo. Ex. 69.)  Instead
of immediately firing Smith, the Superintendent sent a letter to
her about two weeks later stating that he would recommend to the

16

school board that her contract not be renewed another year.
(Def.'s Ex. 107; Def.'s Ex. 111.)

There is little evidence that Smith disputed any of
these allegations in 2010.  Smith's only contemporaneous
rebuttal was a doctor's note explaining her sick leave absence.
(Pl.'s Exs. 14, 15.)[5]

Meanwhile, Smith's discrimination charges remained
under investigation at the EEOC.  Smith supplemented that
investigation in March 2014 by filing an amendment alleging
retaliation for her accommodation requests.  (Def.'s SOF ¶ 72.)
Finally, on June 3, 2015, the EEOC issued a no-action letter.
(Def.'s SOF ¶ 79.)  Smith then timely filed this lawsuit
alleging violations of the Americans with Disabilities Act
("ADA")[6] for failure to accommodation her disability, wrongful
discharge, and discharge in retaliation for her accommodation
requests.  Defendant moved for summary judgment, which Smith
opposed.

## II.  Standard of Review

Summary judgment is appropriate only if the record
shows that "there is no genuine issue as to any material fact

---

[5]   During discovery, Defendant learned that Smith flew to Utah
to attend a conference during the days she called in sick.
(Smith Depo. at 252-54.)  The Court did not consider this fact
in its analysis, however, because no one in the administration
at the time of Smith's termination knew of Smith's deceit.
(Jochems Depo. at 138.)
[6]   42 U.S.C. § 12101 *et seq.*

and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Evans v. Techs. Applications & Serv., Co.*, 80 F.3d 954, 958-59 (4th Cir. 1996) (citations omitted). In reviewing the record on summary judgment, "the court must draw any inferences in the light most favorable to the non-movant [and] determine whether the record taken as a whole could lead a reasonable trier of fact to find for the non-movant." *Brock v. Entre Computer Ctrs.*, 933 F.2d 1253, 1259 (4th Cir. 1991) (citations omitted).

Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *see also Ray Commc'ns, Inc. v. Clear Channel Commc'ns, Inc.*, 673 F.3d 294, 299 (4th Cir. 2012).

### III. Analysis

Defendant raises three arguments in support of its summary judgment motion: (1) administrative exhaustion; (2) laches; and (3) failure to state claims under the ADA as a matter of law. The Court will address each argument in turn.

A.          Administrative Exhaustion

Before bringing a federal claim under the ADA, a plaintiff must exhaust her administrative remedies with the

18

EEOC.  *See Syndor v. Fairfax Cty.*, 681 F.3d 591, 593 (4th Cir. 2012).  Exhaustion requires a plaintiff to file a charge with the EEOC within the timeframe specified by 42 U.S.C. § 2000e-5(e)(1), which in this case is 300 days.[7]  Any subsequent federal lawsuit can advance only those claims stated in the EEOC charge, claims reasonably related to the charge, and claims developed by a reasonable investigation of the charge.  *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 963 (4th Cir. 1996).  The "touchstone" of this analysis "is whether plaintiff's administrative and judicial claims are reasonably related." *Syndor*, 681 F.3d at 595.  If a plaintiff's federal claims exceed the scope of the EEOC charges, the federal claims are jurisdictionally barred.  *Balas v. Huntington Ingalls Indus., Inc.*, 711 F.3d 401, 407 (4th Cir. 2013).  These requirements advance important policy objectives of notifying the employer and facilitating efficient claim resolution by the EEOC.  *See Miles v. Dell, Inc.*, 429 F.3d 480, 491 (4th Cir. 2005); *Chris v. Tenet*, 221 F.3d 648, 653 (4th Cir. 2000).  Thus, exhaustion is important, but "should not become a tripwire for hapless plaintiffs."  *Syndor*, 681 F.3d at 594; *Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 406 (2008).

---

[7]    The 300-day filing period applies because Virginia is a "deferral state."  *Smith v. Strayer Univ. Corp.*, 79 F. Supp. 3d 591, 598 (E.D. Va. 2015) (citing *Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 440 (4th Cir. 1998)).

Defendant contends that Smith failed to exhaust her retaliatory termination and wrongful discharge claims because those allegations did not clearly appear in the EEOC charges. (Mem. in Supp. at 27.)  Additionally, Defendant argues that any allegations of accommodation denials prior to February 2009 were not properly exhausted and are time barred.  (*Id.*)  The Court will address each argument in turn, beginning with the reasonable accommodation claim.

### 1.   Reasonable Accommodation

The Court agrees with Defendant that filing deadlines limit the scope of Smith's claims, but disagrees as to the scope of that limitation.  As mentioned above, a timely EEOC claim must be filed within 300 days of the discriminatory act.  *See* 42 U.S.C. § 2000e-5(e)(1).  By filing her first EEOC charge on January 2, 2010, Smith failed to exhaust any claim of discrimination occurring before March 8, 2009.  (Def.'s Ex. 114.)  Thus, any claims of discrimination occurring before that date are dismissed.  *See Washington v. George G. Sharp. Inc.*, 124 F. Supp. 2d 948, 956 (E.D. Va. 2000) (barring only claims failing outside filing deadline).

Having established the relevant time period, the next question is what accommodations Smith was denied during that period.  It is undisputed that Smith's first and only formal accommodation denial occurred by letter on November 3, 2009.

20

(Pl.'s Ex. 35.)   In that letter, Loudoun Schools' benefit supervisor denied Smith's request for "an in-person interpreter every day of the school year from 7:30 am through 9:00 am," request to "[i]nstall a video phone in your classroom," and any other request for a daily part- or full-time interpreter.   (*Id.*) These accommodation denials also appear in the federal complaint.   (Compl. ¶¶ 8-11, 16.)   Those November 3, 2009 accommodation denials clearly occurred within 300 days of January 2010.   The question, then, is whether those claims appropriately alleged in the January EEOC charge.   The Court finds that they were.

That January 2010 EEOC charge alleges continuing discrimination from February 1, 2009, through November 24, 2009, and that in February 2009 Smith "requested an accommodation but the request was denied."   (Def.'s Ex. 114.)   The brevity of the EEOC charge is not determinative of the exhaustion question in this case.   *See Syndor*, 681 F.3d at 595-97.   Even without details in the charge, the identity of the charging-party, the nature of her known disability, and the dates listed in the charge would immediately lead Defendant to its November 3, 2009 denial letter.   Thus, the charge accomplished its purpose of putting Defendant on notice of the three accommodation denials alleged in the lawsuit complaint.   *Id.* at 596 (considering notice to defendant).   Similarly, the EEOC's investigation of

21

the charge would have led directly to the same denial letter, which encompasses all three of Smith's accommodation denials. *See id.* (considering EEOC investigation).  Accordingly, Smith has adequately exhausted her reasonable accommodation claim for the denial of an in-classroom video phone and a part- or full-time interpreter occurring after March 8, 2009.

### 2.   Wrongful Discharge

To the extent Defendant challenges administrative exhaustion of the wrongful discharge claim, that argument is unpersuasive.  That claim is clearly stated in the April 2, 2010 EEOC charge in which Smith checked the disability box and wrote that her "employment was terminated on 2-22-10" and "I believe that I have been discriminat3ed [sic] against based on my disability in violation of the Americans with Disabilities Act of 1990, as amended."  (*Id.*)  This charge put Defendant on notice that Smith had expanded the scope of her allegations to include a wrongful discharge claim.  The EEOC certainly interpreted the amended charge to make this new allegation, as the EEOC questioned Defendant about the circumstances of Smith's firing.  (Smith Depo. Ex. 17 at 44-45.)  Accordingly, the claim of wrongful discharge was properly exhausted.

### 3.   Retaliatory Termination

Lastly, Defendant argues that the retaliatory termination claim was not properly exhausted because Smith did

not mention retaliation in the January or April 2010 charges and did not check the retaliation box in the March 2014 charge.

Contrary to Defendant's argument, a claim of retaliation is properly exhausted when that claim "is a continuation of the treatment alleged in the charge before the court." *Jones v. Calvert Grp., Ltd.*, 551 F.3d 297, 305 (4th Cir. 2009). Before the EEOC, Smith charged Defendant with failing to accommodate her disability of being deaf and firing her because of that disability. The retaliation claim is based on the same accommodation requests, the same disability, the same relevant time period, and the same adverse employment action alleged in the January and April charges. Thus, the retaliation claim is a clear continuation of the conduct charged. Accordingly, this claim was properly exhausted.[8]

B.     Laches

Before reaching the merits of Smith's claims, the Court must also address Defendant's argument that laches bars this suit. To prove laches, the defendant must show "(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *White v. Daniel*, 909 F.2d 99, 102 (4th Cir. 1990). Defendant argues that both elements are met here because Smith "let the matter

---

[8]     Because of this finding, the Court need not consider whether the March 2014 EEOC charge relates back to the earlier-filed charges.

languish in the EEOC" for over five years after her initial charge, rather than promptly requesting a right to sue.  (Mem. in Supp. at 33.)   The Court disagrees and finds that laches does not bar.

First, Defendant has not proven that Smith "delayed inexcusably or unreasonably in filing suit."  *White*, 909 F.2d at 102.  Smith timely filed her EEOC charge of accommodation denial in January 2010 and amended that charge soon after learning of her firing.  The case then "languished" in the EEOC for five years because of that entity's backlog of cases.  (*See* Smith Depo. Exs. 10, 12, 13 (noting backlog).)  There is no evidence that Smith exacerbated this delay by failing to reply to EEOC investigation requests or by withholding information.  To the contrary, Smith prompted the EEOC for updates about the status of her case in August 2010 (Smith Depo. Ex. 10), December 2012 (Smith Depo. Ex. 12), and September 2013 (Smith Depo. Ex. 13). After that time, evidence indicates Smith was cooperating with the EEOC's active investigation of her charges.  (Smith Depo. Ex. 11.)  Smith then timely brought this federal suit after the investigation closed on June 3, 2015.  (Smith Depo. Ex. 8.) These facts do not demonstrate unreasonable delay.

Second, Defendant has not demonstrated sufficient prejudice in this case.  Contrary to Defendant's argument, the mere fact that some employees have left Loudoun Schools or FHR

does not, in and of itself, create prejudice.  *EEOC v. Lockheed Martin Global Tele., Inc.*, 514 F. Supp. 2d. 797, 804 (D. Md. 2007).  Furthermore, the Court does not find that any forgetful witnesses will distinctly disadvantage Defendant.  *See White*, 909 F.2d at 102 (noting disadvantage element of prejudice).  To the extent memories have faded, there is a substantial document record available to refresh recollections.  Accordingly, the Court will not dismiss this case due to laches.

C.      Discriminatory and Retaliatory Conduct

        The Court will now consider the merits of Smith's claims of failure to accommodate, retaliatory termination, and wrongful discharge.

        1.    Failure to Accommodate

        The ADA's prohibition of "discriminat[ing] against a qualified individual on the basis of disability" creates liability for employers that fail to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual."  42 U.S.C. §§ 12112(a), (b)(5)(A).  To prove a failure-to-accommodate claim, the plaintiff must show that (1) she has a disability; (2) the employer had notice of her disability; (3) she could perform the essential functions of her job with a reasonable accommodation; and (4) the employer refused to make such a reasonable accommodation.  *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 345

25

(4th Cir. 2013).  Even if the plaintiff proves a *prima facie* case, a defendant may avoid liability "if it can show as a matter of law that the proposed accommodation will cause undue hardship in the particular circumstances."  *Reyazuddin v. Montgomery Cty., v. Maryland*, 780 F.3d 407, 414 (4th Cir. 2015).

The only disputed *prima facie* element in this case is whether Defendant denied a reasonable accommodation.  To survive summary judgment on this point, a plaintiff must "present evidence from which a jury may infer that the [proposed] accommodation is reasonable on its face, i.e., ordinarily or in the run of cases."  *Reyazuddin*, 789 F.3d at 414.  The reasonableness of an accommodation depends on whether it "enables the employee to perform the essential functions of the job in question."  *Myers v. Hose*, 50 F.3d 278, 283 (4th Cir. 1995).  Essential job functions are "functions that bear more than a marginal relationship to the job at issue."  *Tyndall v. Nat'l Educ. Ctrs. of Cal.*, 31 F.3d 209, 213 (4th Cir. 1994).  An employer may provide a reasonable accommodation "without providing the exact accommodation that the employee requested." *Reyazuddin,* 789 F.3d at 414.  In other words, "the law requires an effective accommodation, not the one that is most effective for each employee."  *Noll v. Int'l Bus. Machines Corp.*, 787 F.3d 89, 96 (2d Cir. 2015).

Applying the above principles, the Court finds a genuine dispute as to whether the denial of a daily interpreter and an in-classroom video relay phone was reasonable.

a.          Daily Interpreter

The Court will first consider Smith's denied accommodation of the daily presence an interpreter, either part- or full-time.  According to Smith, this accommodation would allow her to perform the essential job functions of regular communication, coordination, and collaboration with her education partners and others in the school evironment.  (Mem. in Opp'n at 26.)  The Court agrees that a reasonable jury could find this accommodation to be reasonable.

Congress clearly contemplated that interpreters could qualify as "reasonable accommodations."  *See* 42 U.S.C. § 12111(9)(B); 29 C.F.R. § 1630.2(o)(2)(ii).  Furthermore, the regulations implementing the ADA refer to interpreters as "a common form of reasonable accommodation."  *Noll*, 787 F.3d at 96 (citing 29 C.F.R. § 1630 app.)  Although this does not mean that an interpreter is *per se* a reasonable accommodation, there is sufficient evidence to find an interpreter reasonable here.

Several sources indicate that some form of impromptu verbal communication is related to essential functions of Smith's job.  Smith's IEP management role requires her to collaborate with general education teachers, sometimes on a

27

"[d]aily, ongoing" basis.  (Kearney Depo. at 35-37; Smith Decl.
¶ 17.)  Additionally, Smith's lesson plan development
occasionally required her to coordinate with general education
teachers, who sometimes came by her room at unplanned times.
(Pl.'s Exs. 28, 42.)  Furthermore, Smith's performance appears
to have been better when she had access to other teachers who
could act as informal ASL interpreters.[9]  (*See* Def. Exs. 30, 52.)
Defendant implicitly recognized the need for some accommodation
for impromptu verbal communication by promising to install a
video interpretation device in November 2009, although this is
fact is not dispositive.  (Pl.'s Ex. 35.)  Unfortunately for
Smith, that device was not installed during her employment at
FHR.  (*See* Kovach Depo. at 79.)  From this evidence, a
reasonable jury could find the request for a daily interpreter
to be reasonable.

Defendant's argument that the availability of on-call
interpreters was an adequate alternate accommodation is not
persuasive.  The on-call interpreters could not fulfill the need
for daily, verbal communication because those interpreters had
to be requested between three and seven days in advance.

---

[9]   Even when these informal interpreters were available,
however, Smith received a reprimand for interpersonal
misconduct, (Smith Depo. Ex. 26), and received a critical review
in the areas of planning and assessment, IEP timeliness,
knowledge base of the curriculum and standards of learning, and
collaboration with general classroom teachers, (Def.'s Ex. 52).

(*Compare* Edwards Dep. at 11, *with* Smith Depo. at 38.)   Smith testified that when she needed an interpreter at the last minute, she "could not have one provided."  (Smith Depo. at 39.) Her attempt to preemptively request a daily interpreter through the standard form was denied.  (Def.'s Exs. 54, 55.)  By not being available on a very short-term or impromptu basis, the on-call interpreters arguably could not accommodate the essential functions requiring impromptu verbal communication. Accordingly, the Court finds that there remains a genuine dispute as to whether the presence of a daily part- or full-time interpreter was a reasonable accommodation.

Defendant also fails to satisfy its burden of demonstrating undue hardship.  An undue hardship is "an action requiring significant difficulty or expense" based on considerations of the nature and cost of the accommodation, the overall financial resources of the employer, and the impact the accommodation might have on the employer, among other factors. *See* 42 U.S.C. § 12112(b)(5)(A), (B).

Defendant's evidence of hardship is sparse.  Defendant presents no estimation of the costs actually associated with hiring an interpreter on a daily basis.  There is also no evidence in the record of Defendant's operating budget or the effect a daily interpreter might have on that budget.  Instead, Defendant presents a statement from the risk management

supervisor that the request for a full-time interpreter "presents a sort of financial hardship situation in that we pay the teacher full-time and then we would have to either pay a contracted interpreter full-time or actually hire an employee who would be assigned to her full-time." (Def.'s Ex. 37.)  This cursory analysis, however, is insufficient to carry Defendant's burden at summary judgment.  As a sister court recently found in a similar case, "even if it is correct that the salary of a full-time ASL interpreter would be twice the salary of a nurse, that in itself does not establish that an ASL interpreter would be an undue hardship." *Searls v. John Hopkins Hospital*, No. CCB-14-2983, 2016 WL 245229, at *8 (D. Md. Jan. 21, 2016). Additionally, administrators' statements that there was no budget allocated for this accommodation has minimal relevance when assessing undue hardship. *See Reyazuddin*, 789 F.3d at 418; *Searls*, 2016 WL 245229, at *7.  Accordingly, the Court will deny summary judgment with respect to this arguably reasonable accommodation.

b.        <u>Video Relay Phone</u>

The Court now considers whether the request for a video relay phone in Smith's classroom was a reasonable accommodation.

There is evidence within the record that essential functions of Smith's job required verbal telecommunication.  In

30

her IEP case management role, Smith was required to consult with parents and other teachers.  (McCartin Decl. at 37.)  This would occasionally require communication when individuals who were off-campus, which requires a phone call or email.  Arguably, an email was not always an efficient way to facilitate these communications, as when contacting JC's parent who speaks Spanish.  (Smith Decl. ¶ 19.)  Additionally, a video relay phone may be required to respond to any emergency situation in the classroom, to request help with unmanageable students, or to communicate with the administration office generally.  (Smith Depo. at 53, 56; Martinez Decl. ¶ 14).)  Defendant appears to recognize the need for some form of verbal telecommunication, as an administrator promised Smith a video phone in 2007.  (Def.'s Ex. 14.)  Furthermore, other deaf teachers within Loudoun Schools appear to have video phones, (Kovach Depo. Ex. 8 at 130), and FHR actually did provide Smith an in-room video phone from the spring 2009 through October 2009.  (Smith Decl. ¶ 18.)  Thus, it is reasonable to conclude that essential function of Smith's job required access to verbal telecommunication.

The accommodations Defendant provided Smith arguably did not effectively accommodate her communication needs.  Two video relay phones were available at FHR.[10]  One was in a

---

[10]    Although Defendant contends that other, non-video relay phones were installed at times, Smith contests that those phones

classroom across the hall from Smith's room and the other was placed in a locked room in the library.  Without a phone in her room, Smith could not place any calls while teaching students. (Smith Depo. at 55-60.)  This limitation arguably impeded her ability to use the phone in an emergency situation or to react to a student's misbehavior.  (*Id.*)  Additionally, Smith contends that she had limited access to the two other phones because one was often in use and she was often denied key access to the second.  (Smith Decl. ¶¶ 20, 24.)  A parent of one of Smith's students supported this claim of reduced access by recalling that Smith made far fewer calls after the phone was removed from her room.  (Cruz Decl. ¶ 3.)

Furthermore, Defendant cannot satisfy its burden of demonstrating undue hardship because the video relay phone was freely provided by the Federal Communications Commission and there is no evidence of financial burden stemming from this accommodation.  (Smith Decl. ¶ 19.)

Accordingly, the Court finds a genuine dispute as to whether Defendant denied Smith a reasonable accommodation by denying her request for an in-classroom video relay phone.

---

ever existed or she ever had access to them.  (Smith Decl. ¶¶ 21-22.)

2.   Retaliatory Termination

The Court turns now to the retaliatory termination claim.  A plaintiff may demonstrate retaliatory termination through either direct or indirect evidence, or through the familiar *McDonnell Douglas*[11] burden-shifting analysis.  Under the latter,[12]  (i) a plaintiff must first establish a *prima facie* case of retaliation, (ii) then the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the termination, (iii) which shifts the burden back to the plaintiff to produce evidence sufficient to find that the defendant's articulated reason is mere pretext for illegal discrimination.  *See Ennis v. Nat'l Ass'n of Bus. & Educ. Radio*, 53 F.3d 55, 58 (4th Cir. 1995).

To establish a *prima facie* case of retaliatory termination, Smith must prove that she "(i) engaged in protected activity and, (ii) because of this, (iii) her employer took an adverse employment action against her."  *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 577 (4th Cir. 2015).

---

[11]   *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800, 802-05 (1973).

[12]   Smith presents no direct or indirect evidence of retaliation.  Nor is her memorandum in opposition fairly read to argue that any such evidence defeats this motion for summary judgment.  Accordingly, the Court will proceed under the *McDonnell Douglas* burden-shifting analysis.  *See Heiko v. Colombo Savings Bank*, 434 F.3d 249, 258 (4th Cir 2006).

Assuming *arguendo* that Smith can prove a *prima facie* case, Defendant has offered several legitimate bases for termination.  In November 2009, Smith was cited for insufficient lesson planning, inadequate IEP case management and student assessment, and strained professional relationships. (Jochems Depo. Ex. 10.)  In February 2010, Jochems wrote that she would recommend not renewing Smith's contract because Smith's planning and instruction did not adequately advance her students' learning, and because Smith did not exhibit a cooperative approach or positive rapport with colleagues.  (*Id.*)  Finally, Jochems recommended Smith's immediate termination on April 13, 2010, for instances of "[o]ngoing and blatant insubordination," "[e]scalating hostile work environment that is impacting the children," and "continued inability to meet deadlines." (Jochems Depo. Ex. 17.)  Such instances of poor performance and insubordination are "widely recognized as valid, non-discriminatory bases for any adverse employment action." *Evans v. Tech. Apps. & Serv. Co.*, 80 F.3d 954, 960 (4th Cir. 1996).

Finding that Defendant has produced evidence of a legitimate and nondiscriminatory reason for termination, the burden shifts back to Smith to show that the proffered reasons were mere pretext for retaliation.  To show pretext, Smith argues that the facts underlying her termination are disputed and that Defendant conducted an inadequate review before placing

her on the December List in November 2009.  Neither argument is persuasive.

Before turning to Smith's attacks on the facts underlying Defendant's bases for termination, the Court must describe the governing principles of the pretext analysis.  A plaintiff may demonstrate pretext by "present[ing] sufficient evidence to create an inference that the proffered legitimate reason for the employment decision has no basis in fact." *Tomasallo v. Fairfax Cty.*, No. 1:15-cv-95, 2016 WL 165708, at *11 (E.D. Va. 2016).  But to succeed in this showing, the plaintiff cannot merely argue that the reason for firing was not "wise, fair, or even correct." *DeJarnette v. Corning Inc.*, 133 F.3d 293, 298-99 (4th Cir. 1998) (quoting *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir. 1997)). Instead, the relevant question is whether the defendant's stated reason "truly was the reason for plaintiff's termination." *Id.* In other words, the plaintiff must present evidence reasonably calling into question the honesty of the employer's belief. *DeJarnette*, 133 F.3d at 299.  In this analysis, it "is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff" or the plaintiff's friends and colleagues. *Evans*, 80 F.3d at 960; *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003).  These principles ensure that the Court "not sit as a kind of super-personnel department weighing

35

the prudence of employment decisions made by firms charged with employment discrimination." *DeJarnette*, 133 F.3d at 298-99. Smith's arguments fail under these standards.

As an initial and dispositive point, the Court notes that Smith did not attempt to dispute several bases for her termination. *See Freeman v. Perdue Farms Inc.*, 496 F. App'x 920, 926 (11th Cir. 2010) ("[W]hen an employer offers multiple reasons for the termination of an employee, the employee must rebut each of the employer's proffered reasons for its actions."); *Tyler v. RE/MAX Mountain States, Inc.*, 232 F.3d 808, 814 (10th Cir. 2000) (same); *Clay v. Holy Cross Hospital*, 105 F.3d 343, 349 (7th Cir. 1997) (same).  Smith presents no evidence to dispute that she repeatedly failed to produce her VGLA binders for administrative review in April 2010 or that she took those binders home in violation of state regulation. (Jochems Depo. Exs. 17-18; McGraw Depo. at 127-28; Jochems Depo. at 139-40; Def.'s Ex. 103.)  Additionally, her own emails demonstrate that she did not timely submit those binders for state testing purposes in April 2010.  (Def.'s Ex. 91.)  Lastly, she does not dispute that she failed to follow sick leave protocol in April 2010 or to have plans in place for a substitute to teach her students while she was away on leave.[13]

---

[13]     Administrators were suspicious that Smith took sick leave for the same days that her leave request was denied.  It

(Jochems Depo. Ex. 17; Def.'s Ex. 103.)  With several legitimate bases for termination not refuted, the Court cannot conclude that Defendant's proffered reasons were pretext for retaliation.

The attacks that Smith does make on the remaining bases for termination do not demonstrate pretext for discrimination.  As described more fully below, her evidence does not discredit the honesty of her employer's belief in her poor performance, but merely shows that some parents and colleagues join Smith in disagreeing with Defendant's assessment of Smith.  As the Fourth Circuit has repeatedly stated, this evidence does not demonstrate a disputed issue of material fact regarding pretext.  *See Ruff v. Target Stores, Inc.*, 226 F. App'x 294, 302 (4th Cir. 2007); *King*, 328 F.3d at 149; *Hawkings v. PepsiCo, Inc.*, 203 F.3d 274, 280 (4th Cir. 2000); *Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 444 (4th Cir. 1998).  A review of some of the bases for Smith's termination will illustrate the insufficiency of her evidence.

First, Smith does not demonstrate that there was no basis in fact to terminate her for unprofessional conduct and strained relations with colleagues.[14]  Smith received letters of

---

was not revealed until this litigation, however, that Smith used this sick leave to attend a conference in Utah.  Because this fact was unknown at the time, it did not form a basis for Smith's termination.  (Smith Depo. at 252-54.)

[14]   This was stated as a basis for not renewing Smith's contract in Jochems's April 13, 2010 letter, (Jochems Depo. Ex.

reprimand or complaints for interpersonal conflicts from Assistant Principal Hammler on March 13, 2009,[15] from Assistant Principal McGraw on October 13, 2009,[16] from Deaf and Hard of Hearing Specialist McCartin on October 13, 2009,[17] from Principal Jochems on October 16, 2009,[18] and March 4, 2010,[19] and from Speech Language Pathologist Miner on March 5, 2010.[20]  She also received reprimands for insubordinate behavior on April 15, 2010,[21] and April 16, 2010.[22]  Smith rebutted the circumstance alleged in several of these letters, including the complaints from October 13, 2009;[23] October 13, 2009;[24] October 16, 2009;[25] and March 4, 2010.[26]  Even crediting Smith's rebuttals that she was not to blame for these conflicts, she cannot demonstrate that Jochems had no basis in fact to conclude that these repeated incidents resulted in an "[e]scalating hostile work environment" and "[s]trained professional relationships with the special education team that has caused undue stress and hurt

---

17), and February 2010 letter, (Pl.'s Ex. 37), and also noted in her November 2009 evaluation, (Def.'s Ex. 69).

[15]   Smith Depo. Ex. 26 (citing two prior reprimands).
[16]   Jochems Depo. Ex. 1.
[17]   McCartin Depo. Ex. 4.
[18]   Def.'s Ex. 61.
[19]   Jochems Depo. Ex. 16.
[20]   Def.'s Exs. 85, 86.
[21]   Def.'s Ex. 103.
[22]   Def.'s Ex. 104.
[23]   Pl.'s Ex. 32.
[24]   Pl.'s Ex. 33.
[25]   Pl.'s Ex. 34.
[26]   Jochems Depo. Ex. 16.

feelings." (Jochems Depo. Ex. 17; Pl.'s Ex. 29.) Nor does she contest that, as a consequence of these and other confrontations, Speech Education Consulting Teacher Lester refused to work with Smith unless an administrator was present. (Def.'s Ex. 74.) As another example of the disruptive effect of Smith's behavior, WeInterpret complained that "[d]ue to ongoing conflicts with various interpreters . . . they are eventually going to have no interpreters willing to work in our school because of [Smith]." (Jochems Depo. Ex. 17.) Smith's rebuttals to these complaints amount to a plea for the Court to conclude that it was unfair for her employer to believe others' recitation of events instead of her own account. That is not the relevant inquiry for a court in a discrimination case and does not create a genuine issue of disputed fact regarding pretext. *See Ruff*, 226 F. App'x at 302.

Second, Smith does not demonstrate a genuine dispute as to the honesty of Defendant's belief that her lesson plans were inadequate.[27] Smith and one of her colleagues declare that the plans were sufficient. (Smith Decl. ¶ 34 ("I fixed my lesson plans the way they told me to, but every time I changed the way I did it to suit them, they found other issues."); Martinez Decl. ¶ 3.) But as the Fourth Circuit has made clear,

---

[27] This deficiency was identified in the June 2009 review (Def.'s Ex. 52), the November 2009 letter (Def.'s Ex. 69), and the February 2010 mid-term review, (Pl.'s Ex. 37).

these opinions have little to no relevance as to the honesty of
Defendant's belief about the plans.  *See King*, 328 F.3d at 149;
*Evans*, 80 F.3d at 960; *Tinsley*, 155 F.3d at 444 ("[A]lthough the
affidavits put forth by Tinsley document the fact that certain
co-workers, Bank customers, and attorneys believed Tinsley was
doing a good job, they fail to address whether management
honestly believed that Tinsley was doing a good job.").
Principal Jochems[28] and the former principal[29] critiqued Smith's
planning and timeliness.  Jochems acted in accordance with that
belief by assigning Smith a mentor to assist her planning, as
was recommended by the prior principal.  (Jochems Depo. at 34-
35; Def.'s Exs. 52, 74.)  These consistent findings of
inadequacy and attempts to assist in remedying that problem
demonstrate the honesty of Defendant's belief in Smith's poor
performance in this area.

Third, Smith cannot demonstrate that there was no
basis in fact to fire her for inadequate IEP management.[30]  Smith
argues that she was not to blame for any late IEP submissions
because she timely provided the IEPs to the students' parents,
who then declined to sign them.  (Smith Decl. ¶ 32.)  In support
of this, Smith cites several emails from September 2009 in which

---

[28]    Def.'s Exs. 69, 37; Jochems Depo. at 94.
[29]    Def.'s Ex. 52.
[30]    This was a basis for critique in the June 2009 review, the
November 2009 review, the February 2010 review, and the April
2010 letter.

one parent did refuse to sign the IEP until changes were made. (Pl.'s Ex. 26.)  But the deaf and hard of hearing specialist at FHR testified that all of Smith's IEP submissions were untimely, not just the September IEP.  (McCartin Depo. at 79.)  And an administrator overseeing IEPs testified that there were procedures for remedying parent holdouts.  (Kearney Depo. at 13-16.)  Furthermore, Smith's arguments amount to complaints that Jochems failed to recognize her excuses for untimeliness, which is not relevant to pretext.  *See Ruff*, 226 F. App'x at 302.

Fourth, Smith does not demonstrate pretext through her repeated arguments that Jochems unfairly judged her teaching effectiveness without fully appreciating the difficulty or methodology of teaching students through ASL.  (*See, e.g.*, Pl.'s Ex. 36 ("This statement does not reflect an understanding of American Sign Language.").)  The Court does not sit as a super-personnel department to determine whose teaching philosophy or approach is better suited to the needs of particular students. *See DeJarnette*, 133 F.3d at 299 ("[I]t is not our province to decide whether the reason was wise, fair, or even correct.").

Furthermore, Smith has not created a genuine dispute that the denial of a reasonable accommodation was the but-for cause of the poor performance leading to her termination.[31]  *See*

---

[31]    To the extent Smith makes this argument, she has not supported it with cases from this Circuit or others.

*Whitfield v. Tennessee*, 639 F.3d 253, 261 (6th Cir. 2011). Several of Smith's citations for poor performance relate to actions that are completely independent of her lack of access to impromptu verbal communication or a video relay phone in her class, including removing state testing binders from the school, failing to timely submit those binders, and noncompliance with sick leave request procedures. Additionally, Smith received critiques for her behavior and performance even when interpreters were present.[32] Lastly, precedent from the Fourth Circuit indicates that Smith's unprofessional behavior cannot be discredited due to the denial of an accommodation. *See Jones v. Am. Postal Workers Union*, 192 F.3d 417, 429 (4th Cir. 1999) ("The law is well settled that the ADA is not violated when an employer discharges an individual based upon the employee's misconduct, even if the misconduct is related to a disability."); *Gasper v. Perry*, No. 97-1542, 1998 WL 393708, at *7 (4th Cir. 1998) (same).

---

[32] For example, at least one interpreter was present at the September IEP meeting during the time that Smith was allegedly obstructing the IEP planning process. (Def.'s Ex. 60.) Interpreters were present for McGraw and Jochems's formal observations in November 2009 and February 2010. (Def.'s Ex. 80; McGraw Depo. Ex. 3.) Additionally, an interpreter was present during an altercation that prompted McCartin to write a letter of reprimand on October 13, 2009. (McCartin Exs. 4, 5.) Some of the complaints about Smith even came from interpreters. (Jochems Depo. Ex. 17.)

42

Smith's argument of an inadequate investigation into her performance is also unavailing.  Smith makes much of the fact that Jochems placed her on the December List in November 2009 without conducting the two formal observations and conferences required by school policy.  (*See* Pl.'s Ex. 16 (explaining policy).)  An employer's decisionmaking process, however, "need not be optimal, or leave no stone unturned; '[r]ather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action."  *Murphy v. Ohio State Univ.*, 549 F. App'x 315, 322 (6th Cir. 2013).  The adverse employment action at issue in this case is Smith's termination.  Jochems investigated Smith's conduct and performance well after the November 2009 formal evaluation before making her recommendation not to renew Smith's contract.  She conducted a formal observation in February 2010, in addition to meeting with Smith on a weekly bases for portions of the school year, and receiving information from Smith's mentors.  Jochems also considered letters of reprimand from other FHR employees and the input of the administrator in charge of Smith's department.  These efforts fall squarely within the realm of reasonably informed decision making, and no reasonable jury could conclude otherwise.

43

In sum, there are several legitimate bases for termination that remain completely uncontested and many others that remain undisputed for purposes of the pretext inquiry. Accordingly, the Court will grant summary judgment as to the retaliatory termination claim.

### 3.   Wrongful Discharge

The Court turns now to the wrongful discharge claim. To establish a claim for wrongful discharge under the ADA, a plaintiff must prove (1) she has a disability; (2) she was discharged; (3) at the time of discharge, she was performing the job at a level that met her employer's legitimate expectations; and (4) her discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination. *Haulbrook v. Michelin N. Am.*, 252 F.3d 696, 702 (4th Cir. 2001); *Ennis*, 53 F.3d at 58.  The Court will consider these elements within the *McDonnell Douglas* burden-shifting analysis because there is no direct or indirect evidence of discrimination in Defendant's action.  *See Heiko v. Colombo Savings Bank*, 434 F.3d 249, 258 (4th Cir 2006).

Smith fails to satisfy the third *prima facie* element requiring that she was performing her job at a level that met her employer's legitimate expectations at the time of her termination.  Smith's reliance on affidavits from her students' parents and favorable performance reviews in May 2008, November

44

2008, and June 2009 is not sufficient.  Under Fourth Circuit
precedent, the letters Smith presents do not demonstrate that
Defendant was satisfied with her performance.  *See King*, 328
F.3d at 149 ("Nor can the fact testimony of King's co-workers
that his lesson plans were comparable to theirs establish this
genuine issue."); *Hawkings*, 203 F.3d at 280 (same); *Tinsley*, 155
F.3d at 444.  Similarly, performance reviews from 2008 and
spring 2009 do not satisfy Smith's burden of proving her
adequate performance when she was terminated in  spring 2010.
*See O'Connor v. Consolidated Coin Caterers Corp.*, 56 F.3d 542,
547 (4th Cir. 1995), *rev'd on other grounds* 517 U.S. 308 (1996)
(considering performance reviews from 1989 irrelevant to whether
employee was performing satisfactorily when he was terminated in
1990).  The inadequacy of these prior reviews is particularly
apparent in cases like this one, where "there is no one 'event'
that 'sparked the termination,' but instead a long string of
performance problems leading up to firing."  *Warch v. Ohio Cas.
Ins. Co.*, 435 F.3d 510, 516-17 (4th Cir. 2006).

        In contrast to Smith's irrelevant, or close to
irrelevant, indications of satisfactory performance, Defendant
presents substantial evidence of its dissatisfaction with Smith.
The record of Defendant's complaints is described more fully
above, but notably included critical performance reviews in
November 2009 and February 2010 in addition to many letters of

reprimand outside of the formal review process.  These negative reviews, combined with the insufficient evidence Smith proffers, lead to only one reasonable conclusion; Smith was not satisfying her employer's legitimate expectations in 2010 when she was terminated.  Thus, Smith's claim of wrongful discharge fails.

Even if Smith could satisfy the prima facie case, however, her claim would fail because she cannot refute her employer's legitimate nondiscriminatory reasons for termination. This conclusion follows from the analysis conducted in Part C.2 above.  Accordingly, the Court will grant Defendant summary judgment with respect to the wrongful discharge claim.

D.        Motion to Reconsider

Smith also asks the Court to reconsider its order partially denying her motion to strike several undisclosed witnesses.  [Dkt. 44.]  In that order, the Court found that Defendant's failure to list eight witnesses in its Federal Rule of Civil Procedure 26(a)(1)(A)(I) disclosure was harmless under Federal Rule Civil Procedure 37(c)(1).  Smith argues that the Court's ruling departs from its opinion in *Reed v. Washington Area Metropolitan Transit Authority*, No. 1:14-cv-65, 2014 WL 2967920 (E.D. Va. July 1, 2014).  Smith's argument is unpersuasive for several reasons.

First, the holding in *Reed* was brought before the Court when the motion in limine was made.  The Court fully

46

considered the import of *Reed* at that time.  A motion to reconsider cannot be based on issues previously before the court simply because the losing party dislikes the outcome.  *See Projects Mgmt. Co. v. DynCorp Int'l, LLC*, 17 F. Supp. 3d 539, 541 (E.D. Va. 2014) ("Importantly, however, a Rule 59(e) motion for reconsideration may not be used to 'reargue[] the facts and law originally argued in the parties' briefs.").

Second, Smith's argument fails to recognize the case-by-case nature of a motion in limine based on Rule 37(c)(1).  *See S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 595 (4th Cir. 2003); *Yeti by Molly Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001) ("[W]e give particularly wide latitude to the district court's discretion to issue sanctions under Rule 37(c)(1).").  Of course, consistency is important in guiding the course of future litigation.  But, *Reed*'s facts are clearly distinguishable from the present case.  In *Reed*, the objecting party was only made aware of the identity of several expert witnesses days before the close of discovery.  *Id.* at *2.  In this case, by contrast, Smith was always aware of the eight witnesses she now objects to, as she was the party who identified them as possessing relevant information.  This distinction may not be critical in all, or even most, cases.  But in this case, the relevance of the witnesses, the minimal surprise to Smith, and Smith's ability to cure the failure with

47

reference to her own disclosures renders Defendant's act
harmless.  Accordingly, the motion for reconsideration will be
denied.

### IV.   Conclusion

For the foregoing reasons, the Court will deny the
motion for summary judgment as to the reasonable accommodation
claim.  The Court will grant the motion for summary judgment as
to the retaliatory termination and wrongful discharge claims.
The Court will deny the motion for reconsideration.

An appropriate order will issue.

 

 

 

 

|                          |  /s/  |
| --- | --- |
| February  18, 2016 | James C. Cacheris |
| Alexandria, Virginia | UNITED STATES DISTRICT COURT JUDGE |